REQUESTED BY: Allen L. Curtis, Executive Director, Nebraska Commission on Law Enforcement and Criminal Justice
QUESTIONS:
 1. Should funds appropriated under Program 196 rightfully go to the Village of Santee, the Santee Tribe, or to Knox County?
 2. Is the original funding language still applicable which requires all law enforcement officers funded under this program to be certified law enforcement officers?
 3. Is the Commission acting properly under Neb. Rev. Stat. § 23-362 by awarding funds to Knox County for the purpose of providing jail services?
CONCLUSIONS:
1. Knox County.
 2. This language in the 1980 appropriation bill is not controlling.
 3. The county is an appropriate recipient, but limiting funding to jail services may violate the statutory mandate that funding be divided as equally as possible between law enforcement and jail services.
Last year, the Legislature appropriated general funds for Program 196, which is labeled as "Law Enforcement Aid" in the appropriation bill. 1999 Neb. Laws L.B. 880, § 231. You have indicated that this Program is tied to Neb. Rev. Stat. § 23-362
(1997), the framework of which dates back to 1957. That statute indicated that its purpose was to equitably distribute the added burden of law enforcement imposed on certain counties of the state due to the passage of Public Law 280 by the Eighty-third Congress. This 1953 federal act resulted in the transfer of some law enforcement responsibilities from the federal government to the state. Over the years, the state has retroceded much of the criminal jurisdiction it acquired over criminal matters in certain areas of the state back to the federal government. See L.R. 37, 80th Legis., Neb. Legis. J. v. 1, p. 1467 (1969) (Indian country in Thurston County) and L.R. 303, 89th Legis., 2nd Sess., Neb. Legis. J. v. 1, p. 91 (1986) (Winnebago Reservation). You have advised there has been no retrocession involving the Santee Tribe and, consequently, eligibility for funding under Neb. Rev. Stat. § 23-362 would be limited to law enforcement and jail operations related to Santee tribal lands.
You have advised that for the past several years the Commission has made payments to the Santee Tribe for the purpose of providing law enforcement services to the Village of Santee. The Village has applied to the Commission for "reimbursement" for the quarter ending September, 2000, but questions have arisen concerning the Village's continuing eligibility for funding, partly because of the focus in Neb. Rev. Stat. § 23-362 upon aid to counties, and because of some language in a 1980 appropriation bill which was carried over into the Commission's "Operating Instruction No. 18" and which conditions eligibility for General Fund aid on, among other things, any funded law enforcement staff being certified. Apparently, there is some question about whether the Village will be able to meet this criterion.
You first ask whether funds from Program 196 should go to the Village, the Tribe, or to Knox County, the county in which the Santee reservation is situated. For the purpose of this inquiry, we will assume you are correct about the effect of retrocession upon the unavailability of funding outside of Knox County. We will also assume that Program 196 is the designated repository for funds appropriated to fulfill the purposes set forth in Neb. Rev. Stat. § 23-362. As you know, this Program is not the only one having to do with state aid. For example, perusal of some of the appropriations to other Programs administered by the Commission reveals several references to "state aid," generally with little, if any, detail regarding how the funds are to be used except as may be gleaned from the short description of the Program. Here, the name given the Program in the 1999 appropriation, "Law Enforcement Aid", is too general to permit us to link it on its face to section 23-362. Your work with the budget process and your familiarity with the history of the Program has undoubtedly allowed you to make the connection between the statute and the Program. Finally, we will assume that the funds presently available to Program 196 have been appropriated to enable the Commission to carry out the provisions of Neb. Rev. Stat. §23-262. We would caution that this does not appear to have always been the case. The 1980 appropriation bill included within the materials you supplied reveals that Program 196 was once captioned "Local Government Action Funds" and was comprised primarily of federal funds. It was only the relatively small portion of the total appropriation which came from general funds and which was designated to be used to assist law enforcement agencies on Indian reservations. See 1980 Neb. Laws L.B. 1002, § 30. This suggests the possibility that funds directed to Program 196 were appropriated with some purpose in mind other than, or in addition to, that set forth in Neb. Rev. Stat. § 23-362. You have given us no reason to believe that this is true at present, however.
We believe that it is the county which is to be the recipient of funds pursuant to Neb. Rev. Stat. § 23-362 (1997). The statute begins with the stated purpose of equitably distributing the burden upon counties which was caused by the withdrawal of federal law enforcement in such counties and concludes with the statement that the payment "shall be made to any county of this state" meeting certain conditions. The only portion of the statute which might open up eligibility to smaller governmental units or the tribes is the language within the statute indicating that the payment is "for the benefit of Indians in any county which has land held in trust by the United States Government for the benefit of Indians to be used for purposes of law enforcement and jail operations." But when read in context, it would be difficult to come to any conclusion but that a county is the intended recipient. Perhaps the above quoted language was added to indicate that the payments were intended to benefit native Americans by beefing up law enforcement in their counties. The language was not always in the law. The statute had been amended seven times after its enactment before this "for the benefit of Indians" language was included in 1983, and it seems likely that the Legislature would have made it more clear if some material shift in intended payees was contemplated. The law establishes criteria for the eligibility of counties, but not for other governmental units. It also expressly permits county boards to use the funds to participate in alcohol related programs with nonprofit corporations, but says nothing about a tribe or municipality being able to participate in such programs. Such silence contributes to our conclusion.
Neb. Rev. Stat. § 23-362 seems sufficiently clear as to the intended recipient of the funds that we were curious as to the genesis of the payments to the Santee Tribe. Perhaps the practice originated at a time when Program 196 was comprised mostly of federal funds which were governed by different terms and conditions than are state general funds appropriated pursuant to Neb. Rev. Stat. § 23-362. The Commission's Operating Instruction No. 18 suggests a different source of authority, however. According to this document:
 The Eighty-sixth Legislative Second Session and subsequent Legislative Sessions have appropriated general funds to the Commission to assist law enforcement agencies located on a reservation. The legislative action was taken to provide law enforcement support for those villages with a limited tax base located on reservation land.
The document goes on to list the criteria for funding set forth in the 1980 appropriation bill. See 1980 Neb. Laws L.B. 1002, § 30. Unlike Neb. Rev. Stat. § 23-362, the appropriation bill indicated the appropriated funds were to be used to assist "any lawenforcement agency located on a reservation which has not retroceded from state jurisdiction in any county with at least 2,500 acres of land held in trust by the United States. . . . " Section 23- 362 did not indicate payments were to be made to the law enforcement agencies directly and did not set forth the ramifications of retrocession upon eligibility for funding. Another distinction is that the appropriation bill predicated eligibility upon the funded law enforcement staff possessing a certificate from the Commission attesting to adequate law enforcement training. Section 23-362 did not include this prerequisite.
The contrast between Neb. Rev. Stat. § 23-362 and the language in the 1980 appropriation bill, which has apparently continued to be implemented through the Commission's Operating Instructions, requires us to consider whether substantive provisions within appropriation bills may be given effect, what happens where those substantive provisions differ from those in the permanent statutes, and, assuming they are ever viable, how long the provisions within an appropriation bill survive.
Appropriation bills are not the place to create new obligations. Article III, § 22 of the Nebraska Constitution gives each Legislature the authority, if not the duty, to make appropriations for the expenses of the Government, but it is the general laws which create the duties and functions which give rise to such expenses. That said, the court has recognized that the Legislature has plenary or absolute power over appropriations and that it may make them upon such conditions and with such restrictions as it pleases within constitutional limits. State exrel. Meyer v. State Bd. of Equalization and Assessment,185 Neb. 490, 500, 176 N.W.2d 920, 926 (1970) (upholding appropriation bill's ceiling on annual expenditures for personal services). One such constitutional limit is that an attempt to exercise control via the appropriation process not go so far as to usurp the authority belonging to another branch of government. Id.
The topic of including substantive provisions within appropriations bills has been addressed by this office on prior occasions. Op. Att'y Gen. No. 92054 (April 1, 1992); Op. Att'y Gen. No. 91020 (March 25, 1991); 1975-76 Rep. Attorney General 281 283 (Opinion Nos. 201 and 202, dated March 16 and 17, 1976). Typical is the Opinion of the Attorney General to Governor Exon dated March 25, 1974, and found at page 1313 of the Legislative Journal of the Eighty-Third Legislature, 2nd Session, 1974. The Opinion addressed an appropriation bill imposing certain requirements for labeling warrants with the fund sources and the allocation against each fund. One of the concerns expressed was that the bill might run afoul of the provision found in Neb. Const. Art. III, § 14 regarding amendatory acts. Arguably, the appropriation bill would have modified a general law which placed the power and authority for such accounting controls with the Director of Administrative Services, but that statute was not referenced or modified as the constitutional provision would seem to require. The Opinion also made note of the practical problems presented by the practice of including substantive provisions within appropriation bills. Such bills are temporary laws which do not appear in the permanent statute books. Rather, they appear only in the Session laws for that year and, thus, are not readily discoverable by the public. The present case provides an excellent example. But for the Commission's Operating Instruction, one would be hard pressed to locate the legislative language on which the Commission relied in determining its payment policy, situated as it is in an appropriation bill two decades old.
Regardless of whether the substantive provisions in the bill were ever valid, they are no longer viable. Neb. Const. ArticleIII, § 22, dictates that each Legislature make appropriations for expenses of the Government, implicitly limiting the lifetime of such bills. Furthermore, language within the bill expressly limited its operable time period. Section 2 of the bill identified it as an appropriation bill for the period of July 1, 1980, to June 30, 1981. The criteria for expenditure of appropriated funds would not have outlived the appropriation, except to the extent such criteria may be found in the permanent laws.
Therefore, the language in the old appropriation bill which made provision for aid of a law enforcement agency does not sway us from our belief that Neb. Rev. Stat. § 23-362 designates the county as the governmental unit to receive these funds from the Commission.
The foregoing discussion answers your question regarding the continuing validity of the 1980 appropriation bill's requirement that all funded law enforcement officers be certified. Because the provisions of the permanent statutes control, we do not believe that the Commission is obliged to ascertain in advance that no uncertified law enforcement staff person will be a beneficiary of the state aid distributed to the county out of this Program. On a related note, we would point out that Neb. Rev. Stat. §§ 81-1401 and 81-1414 require most law enforcement officers to be certified, but officers who are employed for less than 100 hours per year or who were appointed prior to January 1, 1972, are exempt. Also, full law enforcement authority on tribal lands is granted to graduates of the Bureau of Indian Affairs' basic police training program, deeming such training equivalent to that offered by the Nebraska Law Enforcement Training Center. 2000 Neb. Laws § 994, §§ 1 and 9. If the Commission chooses to impose a certification requirement for funding eligibility, we would recommend against erecting certification requirements which are more stringent than those found in statute.
Your final question is whether the Commission is acting appropriately by funding Knox County for jail services. Given what has already been said, the county is an appropriate beneficiary. We do, however, have some concern about restricting funding to jail services. According to Neb. Rev. Stat. § 23-262 , the funding is to be divided as equally as possible between the areas of law enforcement and jail operations.
Sincerely,
 Don Stenberg Attorney General
 Mark D. Starr Assistant Attorney General
Approved: _____________________________
Attorney General